John S. Persell (OSB # 084400)
Oregon Wild
5825 N Greeley Avenue
Portland, OR 97217
Tel: (503) 896-6472
jp@oregonwild.org

Meriel L. Darzen (OSB # 113645)
Crag Law Center
3141 E Burnside Street
Portland, OR 97214
Tel: (503) 525-2725
Fax: (503) 296-5454
meriel@crag.org

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# PORTLAND DIVISION

**OREGON WILD**,

          Plaintiff,

   v.

**UNITED STATES FOREST SERVICE**,
a federal agency,

          Defendant.

Case No. 3:23-cv-00935-SB

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

(Violations of National Environmental Policy Act; Administrative Procedure Act)

1 – FIRST AMENDED COMPLAINT

**INTRODUCTION**

1.      Mt. Hood National Forest straddles the Cascade Crest in northern Oregon, resulting in a remarkable diversity of forest types. Between the temperate rainforest of Douglas-firs on the west side—where precipitation falls most heavily—and the eastern ponderosa pine stands within the Cascade Range's rain shadow, lies a zone where wetter forest gradually transitions to drier conditions from west to east and from higher elevations to lower elevations.

2.      Within this transition area of moist mixed-conifer forest, northern spotted owls continue to seek haven among mature and old-growth stands, struggling for survival in the face of habitat loss due to logging and wildfires as well as competition from invasive barred owls.

3.      In this unique transition zone of Mt. Hood National Forest, and overlapping designated critical habitat for the spotted owl, the United States Forest Service recently authorized the Grasshopper Restoration Project in Hood River and Wasco counties adjacent to the southern edge of the Badger Creek Wilderness.

4.      Stretching approximately seven miles from picturesque Boulder Lake in the west almost to the Bonney Crossing Campground in the east, the Grasshopper Project area primarily consists of mature and old-growth stands surrounding the headwaters of Boulder and Threemile creeks. In addition to providing valuable spotted owl habitat, these stands store, absorb, and sequester incredible amounts of carbon—a natural and critically important tool to combat climate change recognized in a recent executive order issued by President Biden.

Fig. 1 – Map of the Grasshopper Project Vicinity within Mt. Hood National Forest



5.    The Forest Service says it aims to reduce the risk of high-intensity wildfires and to restore and protect wildlife habitat throughout the Grasshopper Project area, primarily through commercial logging that will reduce forest canopy cover and stand density, and remove 19.5 million board feet of timber—enough to fill 4,000 logging trucks.

6.    Yet the agency acknowledges that most of the western portion of the Project area is operating within the range of normal in terms of wildfire.

7.    For non-plantation (*i.e.*, natural) stands in the Grasshopper Project area, the Forest Service authorized "variable density thinning" (VDT). Many of these stands have never previously been logged or have experienced very little management.

8.    Scientific research has not shown VDT to be effective at reducing weather-driven wildfire risk or to benefit currently suitable spotted owl habitat in mature, moist mixed-conifer forest stands like those in the western portion of the Grasshopper Project area.

9.    Stands in the farther eastern portion of the Project area, meanwhile, may not be operating within the range of normal, in large part due to past suppression of wildfires, but they provide valuable suitable northern spotted owl habitat.

10.    The Forest Service admits that the Grasshopper Project will adversely affect Endangered Species Act-listed northern spotted owls by degrading over 1,200 acres of currently suitable habitat—most of which is designated *critical* habitat.

11.    Without undertaking a full and lawful environmental analysis or rationally explaining its decision, the Forest Service approved commercial logging in mature, moist mixed-conifer forest that is operating within the range of natural conditions. Such logging will degrade suitable and critical habitat for the northern spotted owl, emit the greenhouse gas carbon dioxide, and eliminate current and future carbon storage.

12.    In addition, the Forest Service authorized the Gate Insect and Disease Project just a few miles south of the Grasshopper Project without analyzing the cumulative effects of the two projects—and other recently authorized projects—on spotted owls, critical habitat, and other environmental values.

13.    The Forest Service has also indicated that it intends to authorize the 27 Road Fuel Break Project imminently. The 27 Road Fuel Break Project lies directly north of the eastern end of the

Grasshopper Project, and will also remove and degrade suitable and critical spotted owl habitat and adversely affect the species.

14.     Plaintiff Oregon Wild hereby challenges the Forest Service's January 11, 2023, Decision Notice/Finding of No Significant Impact (DN/FONSI) authorizing the Grasshopper Project for violations of the National Environmental Policy Act (NEPA) and the Administrative Procedure Act (APA).

15.     This action seeks a declaration that the Forest Service violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, and its implementing regulations by (a) failing to prepare an Environmental Impact Statement (EIS) for the Grasshopper Project, and (b) failing to take a "hard look" at the Project's environmental impacts.

16.     This action also seeks an injunction prohibiting the Forest Service, its contractors, assigns, and other agents from proceeding with the Grasshopper Project unless and until this Court determined that the violations of law set forth herein have been corrected. The requested relief is necessary to preserve the status quo, to prevent illegal agency action, and to forestall irreparable injury to the environment.

## JURISDICTION

17.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (federal question), 2201 (injunctive relief), 2202 (declaratory relief), and 28 U.S.C. § 1346 (United States as a Defendant).

18.     This cause of action arises under the laws of the United States, including the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*, and NEPA, 42 U.S.C. §§ 4321 *et seq.* An actual, justiciable controversy exists between Plaintiff and Defendant, and the requested relief is therefore proper under 28 U.S.C. § 2201–02 and 5 U.S.C. §§ 701–06.

5 – FIRST AMENDED COMPLAINT

19.     Plaintiff Oregon Wild has exhausted available administrative remedies by submitting timely comments on the Grasshopper Project draft Environmental Assessment (EA) and a timely objection to the Forest Service's final EA, draft Decision Notice (DN), and Finding of No Significant Impact (FONSI) for the Project. In the ordinary course, the challenged actions or failures to act are subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706.

## VENUE

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, Plaintiff and Defendant reside in this district, and the public lands and resources at issue are located in this district. The District Ranger for the Mt. Hood National Forest's Barlow Ranger District, located in the city of Dufur in Wasco County, Oregon, authorized the challenged Grasshopper Project decision. Pursuant to Local Rule 3-2(b), this case is properly filed in the Court's Portland Division in Portland, Oregon.

## PARTIES

21.     Plaintiff OREGON WILD is a non-profit organization with approximately 20,000 members and supporters throughout the State of Oregon and the Pacific Northwest. Oregon Wild is headquartered in Portland, Oregon. Oregon Wild's mission is to protect and restore Oregon's wildlands, wildlife, and waters as an enduring legacy for future generations. Oregon Wild's wilderness, old-growth forest, and clean rivers/watersheds programs protect pristine drinking water, unparalleled recreation opportunities, and fish and wildlife habitat across Oregon, as well as help stabilize the global climate.

22.     Oregon Wild's staff and members regularly visit the Grasshopper Project area and surrounding federal lands. Oregon Wild seeks to ensure that the Forest Service faithfully and

fully implements and complies with federal laws in managing the natural resources of the Grasshopper Project area and Mt. Hood National Forest as a means of protecting the interests of its staff and members. Oregon Wild's staff and members hike, camp, observe and photograph scenery, habitat, and wildlife, rely on its mature and old-growth trees for carbon storage as a natural climate solution, and use and engage in other vocational, scientific, and recreational activities in and around the Grasshopper Project area. Oregon Wild's staff and members derive recreational, inspirational, educational, and aesthetic benefit from their frequent activities within the Grasshopper Project area and surrounding forested lands and waters and on an ongoing basis in the future.

23.     Plaintiff Oregon Wild has organizational interests in the proper and lawful management of public lands and protected species within the Mt. Hood National Forest. Oregon Wild and its members will sustain injury to aesthetic, recreational, spiritual, and educational interests if the Forest Service implements the Grasshopper Project and if Defendant fails to undertake proper actions to adhere to statutes enacted by Congress to protect the environment and to protect threatened and endangered wildlife species. Unless this Court grants the requested relief, Plaintiff and its members, supporters, and staff will be adversely and irreparably harmed by implementation of the logging prescribed for the Grasshopper Project.

24.     Defendant UNITED STATES FOREST SERVICE is an agency or instrumentality of the United States charged with managing the public lands and resources of the Mt. Hood National Forest and other units of the National Forest System in accordance and compliance with federal laws and regulations. The Forest Service authorized the Grasshopper Project challenged in this action.

**STATEMENT OF LAW**

**National Environmental Policy Act (NEPA)**

25.    Congress enacted NEPA to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the nation." 42 U.S.C. § 4321.

26.    The Council of Environmental Quality (CEQ) promulgated uniform regulations implementing NEPA that are binding on all federal agencies. 42 U.S.C. § 4342; 40 C.F.R. §§ 1500 *et seq.* Although CEQ modified the NEPA regulations by final rule on July 16, 2020 (and then rescinded some of the modifications by final rule on April 20, 2022), in approving the Grasshopper Project the Forest Service relied on the previous version of the CEQ regulations, 40 C.F.R. §§ 1500–1508 (2019). All citations to the CEQ regulations in this complaint are to the 2019 version of the regulations.

27.    NEPA's primary purposes are to ensure fully-informed decision-making by federal agencies and to provide for informed public participation in environmental analyses and decision-making processes. 40 C.F.R. § 1500.1(b) & (c).

28.    To accomplish these purposes, NEPA requires federal agencies to prepare a "detailed statement" for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Commonly known as an Environmental Impact Statement (EIS), the detailed statement must describe, *inter alia*, the adverse environmental impacts of the proposed action and alternatives to the proposed action. *Id.*

29.     To determine whether an action requires an EIS, an agency may prepare an

Environmental Assessment (EA). 40 C.F.R. § 1501.4(b). An EA is a concise public document

that briefly describes the proposal, examines reasonable alternatives, and provides a list of

individuals and agencies consulted. 40 C.F.R. § 1508.9. If the agency decides an EIS is not

required, it must supply a convincing statement of reasons that explains why a project's impacts

are not significant.

30.     To determine whether environmental impacts may be significant, CEQ regulations

require an agency to consider both the context of an action and its intensity. 40 C.F.R. § 1508.27.

31.     An agency must analyze the significance of an action in several contexts, including

society as a whole, the affected region, the affected interests, and the locality. *Id.* § 1508.27(a).

32.      CEQ regulations require consideration of a non-exhaustive list of intensity factors,

including: whether impacts are both beneficial and adverse; the degree to which the effects of the

project are likely to be highly controversial; whether the possible effects are highly uncertain or

involve unknown risks; whether the action will impact areas with unique characteristics of the

geographic area (such as ecologically critical areas); the degree to which the action threatens

endangered or threatened species of their critical habitat; and whether the action is related to

other actions that together with it have cumulatively significant impacts. *Id.* § 1508.27(b).

33.     Whether in an EIS or EA, an agency must take a "hard look" at the direct, indirect, and

cumulative environmental impacts of a proposed action. *Id.* §§ 1502.16 & 1508.7–8. Direct

impacts are those that are caused by the action and occur at the same time and place. *Id.* §

1508.8(a). Indirect impacts are also caused by the action, but occur later in time or are farther

removed in distance. *Id.* § 1508.8(b). Cumulative impacts are the impacts of the proposed action,

as well as impacts from other past, present, and reasonably foreseeable future actions, both

federal and non-federal. 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions." *Id.*

34.     The NEPA documentation must provide the decision-maker and the public with adequate information, evidence, and analysis to fully assess the potential impacts of the proposed action before a decision is made. 40 C.F.R. § 1500.1(b). NEPA requires an agency to ensure the professional integrity, including the scientific integrity, of the NEPA analysis. *Id.* § 1502.24.

35.     Agencies must "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment," *id.* § 1500.2(d), and must integrate the NEPA process with other planning at the earliest possible time to ensure that planning and decisions reflect environmental values. *Id.* § 1501.2.

**Endangered Species Act (ESA)**

36.     Congress enacted the ESA, in part, to provide a "means whereby the ecosystems upon which endangered and threatened species depend may be conserved," and "a program for the conservation of such endangered and threatened species." 16 U.S.C. § 1531(b).

37.     To accomplish these purposes, Section 4 of the ESA directs FWS to determine whether terrestrial species are "endangered" or "threatened" based on habitat loss, overutilization, disease or predation, inadequate regulatory mechanisms, or other natural or manmade factors. *Id.* § 1533(a)(1)(A)–(E); 50 C.F.R. § 402.01(b); 50 C.F.R. §§ 17.11 & 17.12.

38.     Under the ESA, "endangered" means a species "is in danger of extinction throughout all or a significant portion of its range," while "threatened" means a species "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(6) & (20).

39.     If FWS determines a species is endangered or threatened, the agency must also "designate any habitat of such species which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A)(i).

40.     "Critical habitat" means "the specific areas . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." *Id.* § 1532(5)(A)(i).

41.     Section 7 of the ESA requires that every federal agency, in consultation with FWS for terrestrial species, "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of" designated critical habitat for such species. *Id.* § 1536(a)(2). Agencies must "use the best scientific and commercial data available" to fulfill their Section 7 obligations. *Id.*

42.     "Formal consultation" between an action agency and FWS is required when a proposed action is likely to adversely affect a listed species or critical habitat. 50 C.F.R. § 402.14(a)–(b).

43.     At the conclusion of formal consultation, FWS must issue a "biological opinion" (BiOp) explaining whether the proposed action is likely to result in jeopardy to the species or destroy or adversely modify critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h).

**National Forest Management Act (NFMA)**

44.     The National Forest Management Act (NFMA) requires the Forest Service to develop, maintain, and revise Land and Resource Management Plans (LRMPs) for each unit of the National Forest System. 16 U.S.C. § 1604(a).

45.     Each LRMP must include components that will "provide for diversity of plant and animal communities" within the applicable system unit. *Id.* § 1604(g)(3)(B).

46.     All site-specific actions authorized by the Forest Service must be consistent with the relevant LRMP. 16 U.S.C. § 1604(i).

47.     The Forest Service adopted the Mt. Hood National Forest LRMP (Forest Plan) in 1990.

48.     In 1994, the Forest Service and the Bureau of Land Management (BLM) issued a Record of Decision for the Northwest Forest Plan, establishing management requirements for all Forest Service and BLM lands within the range of the northern spotted owl.  The agencies adopted the Northwest Forest Plan, in part, to "provide for the continued viability of the northern spotted owl on federal lands as required by NFMA and furthermore [to] provide the federal lands contribution to recovery of the northern spotted owl under the ESA."

49.     The Northwest Forest Plan amended all relevant pre-existing national forest LRMPs, including the 1990 Mt. Hood National Forest Plan.

**Administrative Procedure Act (APA)**

50.     The APA confers a right of judicial review on any person adversely affected by agency action. 5 U.S.C. § 702.

51.     "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." *Id.* § 704.

52.     Upon review, a court shall hold unlawful and set aside agency actions found to be arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law. *Id.* § 706(2).

12 – FIRST AMENDED COMPLAINT

## STATEMENT OF FACTS

**Northern Spotted Owl**

53.     The northern spotted owl (*Strix occidentalis caurina*) lives in structurally complex late-successional and old-growth forests from southern British Columbia south through Washington, Oregon, and northern California.

54.     The Forest Service and BLM generally consider "late-successional forests" to be "stands in mature (80+ years) and old-growth seral stages."

55.     Due to widespread loss of habitat to logging and natural disturbances, as well as the inadequacy of existing regulatory mechanisms to conserve the species, FWS listed the northern spotted owl as "threatened" under the ESA on June 26, 1990. 55 Fed. Reg. 26,114 (June 26, 1990) (codified at 50 C.F.R. § 17.11(h)).

56.     FWS first designated critical habitat for the species in 1992, then revised the designation in 2008. 73 Fed. Reg. 47,325 (Aug. 13, 2008). In response to litigation, FWS again revised its designation of critical habitat for the northern spotted owl in 2012. 77 Fed. Reg. 71,876 (Dec. 4, 2012).[1]

57.     FWS designated federal lands as critical habitat that contained four essential physical and biological features for the northern spotted owl: (1) forest types that support the species; (2) nesting and roosting habitat; (3) foraging habitat; and (4) dispersal habitat. *Id.* at 71,906–07.

58.     Nesting and roosting habitat for spotted owls "provides structural features for nesting, protection from adverse weather conditions, and cover to reduce predation risks for adults and young," and consists of forest stands with moderate to high canopy cover (60% to over 80%)

---

[1] FWS revised its designation of northern spotted owl critical habitat yet again in 2021, but that revision did not affect any previous designations within or surrounding the Grasshopper Project area. 86 Fed. Reg. 62,606 (Nov. 10, 2021).

with a high basal area (greater than 240 square feet per acre) that are multi-layered and made up of multiple species, with large diameter overstory trees. 77 Fed. Reg. at 71,907. Such habitat also includes large live trees with deformities, large snags and fallen trees, and sufficient space underneath the canopy for spotted owls to fly. *Id.*

59.    Nesting and roosting habitat may also provide foraging habitat, which can vary across the species' range but requires at least 40% canopy cover. *Id.* at 71,906–07.

60.    Combined, FWS considers nesting, roosting, and foraging (NRF) habitat to be "suitable habitat" for northern spotted owls. *See id.* at 71,902.

61.    Northern spotted owl habitat also includes dispersal habitat, which supports the species' "transience and colonization phase" as juveniles move away from their parents post-fledging. *See id.* at 71,906. Dispersal habitat "may currently be marginal or unsuitable for nesting, roosting, or foraging," but FWS "expect[s] dispersal success is highest when dispersers move through forests that have the characteristics of nesting-roosting and foraging habitats." *Id.* at 71,902.

62.    Dispersal habitat "provides an important linkage function among blocks of nesting habitat both locally and over the owl's range that is essential to its conservation." *Id.* at 71,906.

63.    Juvenile male northern spotted owls disperse up to 12.7 miles from their natal sites, while juvenile females disperse up to 17.2 miles. *Id.* at 71,900 (citing Forsman *et al.* 2002).

64.    FWS recommended that in northern spotted owl critical habitat, land managers should "[f]ocus active management in younger forest, lower quality owl habitat, or where ecological conditions are most departed from the natural or desired range of variability." *Id.* at 71,882.

65.    FWS also said that "[i]f a project produces an effect on critical habitat that is wholly beneficial, insignificant, or discountable, then the project is not likely to adversely affect critical

habitat." 77 Fed. Reg. at 71,939. However, "[i]f the effects of the project have more than an insignificant or discountable impact on the ability of the [physical and biological features] to provide life-history functions for the northern spotted owl, then the project is likely to adversely affect northern spotted owl critical habitat . . . ." *Id.* at 71,940.

66.     4,238 acres of the Grasshopper Project area are within the East Cascades North northern spotted owl critical habitat unit, specifically the ECN 7 subunit.

67.     The ECN 7 "subunit is expected to function primarily for demographic support to the overall population, as well as north-south and east-west connectivity between other subunits and critical habitat units." 77 Fed. Reg. at 71,929.

68.     "Demographic support" refers to population clusters or concentrations of spotted owls to support overall survival and recovery.

69.     In 2011, FWS released a Revised Recovery Plan for the northern spotted owl that "recommends retaining more occupied spotted owl sites and unoccupied, high value spotted owl habitat on all lands."

70.     FWS enumerated "recovery actions" to carry out the Revised Recovery Plan, including Recovery Action 10: "Conserve spotted owl sites and high value spotted owl habitat to provide additional demographic support to the spotted owl population."

71.     FWS recommended that land managers should "prioritize known and historic spotted owl sites for conservation and/or maintenance of existing levels of habitat, particularly sites with greater than 40 percent suitable habitat in home ranges, and greater than 50 percent suitable habitat in core areas."

72.     A spotted owl home range consists of a radius circle 1.2 to 1.5 miles around a known or potential spotted owl activity center. A spotted owl core area encompasses either a radius circle

0.5 mile or at least 500 acres around the best habitat within a known or potential spotted owl site—where a spotted owl is mostly likely to nest, roost, forage, and rear young.

73.    Recovery Action 32, meanwhile, directs land managers to "work with [FWS] . . . to maintain and restore" high-quality spotted owl habitat, *i.e.*, "well distributed, older and more structurally complex multi-layered conifer forests . . . characterized as having large diameter trees, high amounts of canopy cover, and decadence components such as broken-topped live trees, mistletoe, cavities, large snags, and fallen trees." These high-quality habitat patches are to be protected on federal land regardless of land allocation

74.    According to FWS, northern spotted owl "[p]opulation growth can occur only if there is adequate habitat in an appropriate configuration to allow for the dispersal of owls across the landscape." 77 Fed. Reg. at 71,884.

75.    Since FWS first listed the northern spotted owl as "threatened" under the ESA, the barred owl has emerged as major threat to the spotted owl's recovery and survival. *Id.* at 71,878 & 71,885.

76.    "Barred owls compete with spotted owls for habitat and resources," negatively affecting spotted owls. 77 Fed. Reg. at 71,878. Any "loss of [suitable spotted owl] habitat has the potential to intensify competition with barred owls by reducing the total amount of resources available to the northern spotted owl and by increasing the likelihood and frequency of competitive interactions." *Id.*

77.    In 2020, FWS found that "the stressors acting on the [northern spotted owl] and its habitat, particularly rangewide competition from the nonnative barred owl and high-severity wildfire, are of such imminence, intensity, and magnitude to indicate that the northern spotted owl is now in danger of extinction throughout all of its range." 85 Fed. Reg. 81,144, 81,146

(Dec. 15, 2020). FWS determined "that reclassification of the northern spotted owl from a threatened species to an endangered species is warranted but precluded by higher priority actions." 85 Fed. Reg. at 81,144.

78.    In 2016, scientists estimated that from 1985 to 2013, the total northern spotted owl population declined by almost four percent per year. *See* Dugger *et al.*, The effects of habitat, climate, and Barred Owls on long-term demography of Northern Spotted Owls. *The Condor: Ornithological Applications*, Vol. 118, pp. 57–116 (2016), available at

https://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=2801&context=icwdm_usdanwrc.

79.    The most recent meta-analysis published in 2021 indicates an accelerated decline of northern spotted owl populations since 2014. *See* Franklin *et al.*, Range-wide declines of northern spotted owl populations in the Pacific Northwest: A meta-analysis. *Biological Conservation* 259 (2021), available at

https://www.fs.usda.gov/pnw/pubs/journals/pnw_2021_franklin001.pdf.

80.    Franklin *et al.* hypothesized that without management to address barred owls, the northern spotted owl faces eventual competitive exclusion throughout its range.

81.    Competition between barred owls and spotted owls can be mitigated to an extent by conserving suitable spotted owl habitat. *See* Wiens *et al.*, Invader removal triggers competitive release in a threatened avian predator. *Proceedings of the National Academy of Sciences*, 118:31 (2021), available at https://www.pnas.org/content/pnas/118/31/e2102859118.full.pdf.

82.    Franklin *et al.* also noted that under normal weather conditions, "intact stands of forests used by [northern spotted owls] for nesting and roosting may serve as fire refugia," and also emphasized "the importance of maintaining [northern spotted owl] habitat on the landscape, even if it is unoccupied . . . in the face of competitive exclusion by [barred owls]," because such

maintenance allows for re-colonization by spotted owls following reduction of barred owl populations, and facilitates connectivity by dispersing spotted owls among occupied areas.

**Executive Order 13990**

83.    On January 20, 2021, shortly after taking office, President Biden issued Executive Order (EO) 13990, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, which stated that "[i]t is essential that agencies capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account." *See* 86 Fed. Reg. 7,037, Sec. 5 (Jan. 20, 2021).

84.    Further, EO 13990 stated that calculating and disclosing "[a]n accurate social cost is essential for agencies to accurately determine the social benefits of reducing greenhouse gas emissions when conducting cost-benefit analyses of regulatory and other actions." *Id.*

85.    An Interagency Working Group issued a Technical Support Document with interim estimates of the social cost of carbon in February of 2021 pursuant to EO 13990.

**Executive Order 14072**

86.    On Earth Day of 2022, President Biden issued Executive Order 14072, *Strengthening the Nation's Forests, Communities, and Local Economies*, which emphasized the important of mature and old-growth forests on Federal lands for the health, prosperity, and resilience of communities. *See* 87 Fed. Reg. 24,851, Sec. 1 (April 22, 2022).

87.    EO 14072 stated the Biden Administration's policy "to conserve America's mature and old-growth forests on Federal lands." *Id.*

88.    EO 14072 said the Biden Administration "will manage forests on Federal lands, which include many mature and old-growth forests, to promote their continued health and resilience; retain and enhance carbon storage; conserve biodiversity; mitigate the risk of wildfires; enhance

climate resilience; enable subsistence and cultural uses; provide outdoor recreational opportunities; and promote sustainable local economic development." 87 Fed. Reg. at 24,852, Sec. 2.

89.     To conserve mature and old-growth forests, the EO directed the Secretaries of Agriculture and the Interior to, within one year, "define, identify, and complete an inventory of old-growth and mature forests on Federal lands, accounting for regional and ecological variations, as appropriate, and shall make such inventory publicly available." *Id.*

90.     In April of 2023, the Secretaries released working definitions and an inventory for mature and old-growth forests, along with a coarse mapping tool that indicates significant amounts of mature and old-growth in the Grasshopper Project area, particularly the western half.

**The Grasshopper Project**

91.     The Forest Service issued a public scoping notice for the Grasshopper Project on July 15, 2019.

92.     Oregon Wild submitted timely scoping comments on the proposed Project with the Forest Service on August 14, 2019.

93.     The Grasshopper Project area lies within the White River Watershed directly south of the Badger Creek Wilderness in Mt. Hood National Forest, stretching from the Boulder Lake area in the west nearly to the Bonney Crossing Campground in the east.

94.     The Grasshopper Project area spans a unique climatic zone in Mt. Hood National Forest where wetter conditions and moist mixed-conifer stands gradually transition eastward toward drier conditions more often dominated by ponderosa pine stands.

95.     The Forest Service says the purpose of the Grasshopper "Project is to conduct activities within the project area to improve the health and vigor of forested stands," and that "[t]here is a

need to reduce risks associated with high-intensity wildfires, to enhance, restore, and protect

wildlife habitat, and to contribute to a sustainable supply [of] forest products that will help

maintain the stability of local and regional economies."

96.     On February 19, 2022, the Forest Service released a Draft EA for the Grasshopper

Project.

97.     In the Draft EA, the Forest Service analyzed three alternatives: a no action alternative;

Alternative 1, which would authorize VDT, commercial thinning, and sapling thinning; and

Alternative 2, which would authorize all of the same methods as Alternative 1 and also

shelterwood harvest.

98.     Oregon Wild submitted timely comments on the Draft EA for the Project with the Forest

Service on March 21, 2022.

99.     On September 2, 2022, the Forest Service released a Final EA for the Grasshopper

Project, along with a draft DN/FONSI indicating the Forest Service would select Alternative 1

for implementation.

100.    Oregon Wild submitted a timely objection to the Final EA and draft DN/FONSI on

October 17, 2022.

101.    On January 11, 2023, the Forest Service issued a final DN/FONSI for the Grasshopper

Project, again selecting Alternative 1 as the chosen alternative.

102.    Alternative 1 authorizes a commercial logging method called variable-density thinning

(VDT) on 3,503 non-plantation acres, primarily among late-successional stands, along with

sapling thinning and commercial thinning in plantations on 1,422 acres and 355 acres,

respectively.

103.    VDT logs forest stands down to different stand densities—or in this case different basal areas—in different areas. Basal area is a measurement of the square feet per acre of trees at breast height, and an indication of stand density.

104.    VDT as approved in the DN is not limited based on stand age or forest type.

105.    Pursuant to the DN, the Forest Service authorized the cutting of Douglas-fir, grand fir, noble fir, western hemlock, mountain hemlock, and Pacific silver fir trees of any size in VDT units.

106.    Under Alternative 1, the Forest Service authorized a reduction of basal area within ranges as low as 40 square feet per acre in many units, including in units with current spotted owl habitat and in units where canopy cover is already near or below 40%.

107.    The age class of stands across 80% of the Grasshopper Project area is over 80 years. To achieve the prescribed basal area ranges for VDT units, many of the large, old trees that make up these stands will be logged.

108.    In VDT units with currently suitable spotted owl habitat and canopy cover over 60%, a reduction in basal area to as low as 40 square feet per acre will necessarily reduce canopy cover far below the level needed for nesting and roosting, and also below the level need for foraging in many instances.

109.    Under Alternative 1, the highest basal area that may be left in VDT units after treatment is 150 feet per square acre, far below the 240 square feet per acre that spotted owls need for nesting and roosting habitat.

110.    The Final EA states that "proposed treatments are intended to reduce severity of future fires and promote long-term retention of the untreated suitable [northern spotted owl] habitat."

111.    The western, higher-elevation, wetter portion of the project area consists mostly of stands in Fire Regime IVC (3,692 acres), meaning they typically burn every 100 to 200 years in stand-replacing fires.

112.    The Forest Service's Fuels Report for the Grasshopper Project indicates that these stands are operating within the range of natural conditions.

113.    The Final EA states that under Alternative 1, VDT would occur in both recently treated stands and stands that have had little or no management.

114.    Within VDT units, the Forest Service also authorized gaps (canopy openings akin to clearcuts) up to two acres in size.

115.    According to the Vegetation Treatment Table in Appendix B to the Final EA, at least 1,300 acres of wet/moist forest stands will be treated with VDT.

***Analysis of Northern Spotted Owls and Critical Habitat for the Grasshopper Project***

116.    The Grasshopper Project area contains thousands of acres of suitable northern spotted owl habitat, including 4,428 acres of designated critical habitat within the East Cascades North unit, subunit ECN 7.

117.    Seven historic northern spotted owl home ranges overlap the Grasshopper Project area. One spotted owl pair has been documented in the Boulder Creek drainage in the western part of the Project area.

118.    Alternative 1, selected in the DN, would reduce suitable habitat in three spotted owl core areas and all seven home ranges. In two of the core areas, suitable habitat would be reduced to or nearly to the lowest threshold needed by spotted owls. Similarly, in four of the home ranges, suitable habitat would be reduced to or nearly to the lowest threshold.

119.    According to the Wildlife Report, the Grasshopper Project would reduce prey for spotted owls in the long-term.

120.    The Wildlife Report also indicates that treatments that reduce canopy cover to 40% will delay the attainment of late seral conditions needed by spotted owls for as much as 75 to 100 years.

121.    Neither the Final EA nor the Wildlife Report indicate the number of Recovery Action 32 habitat acres within the Grasshopper Project area, nor their geographic distribution, yet the Forest Service stated the Project is consistent with the Revised Recovery Plan for spotted owls.

122.    The selected alternative, Alternative 1, would remove 610 acres of spotted owl dispersal habitat from the Project area, downgrade 1,234 acres of suitable habitat to dispersal-only habitat, and reduce the quality of an additional 1,773 acres of suitable habitat.

123.    Alternative 1 would also reduce the quality of 1,181 acres of suitable critical habitat for the spotted owl, downgrade 839 acres of suitable critical habitat for the spotted owl to dispersal-only habitat, and remove 610 dispersal acres within critical habitat.

124.    "Downgrade" generally means to convert nesting or roosting habitat for northern spotted owls to foraging or dispersal habitat, while "remove" means to eliminate all habitat function for the species, including foraging and dispersal.

125.    According to the Forest Service's Wildlife Report for the Project, the downgrading of suitable habitat will adversely affect the northern spotted owl, but the removal of dispersal habitat will not.

126.    The Forest Service further determined that fuel treatment activities will adversely affect the spotted owl due to impacts on prey species, and road construction impacts will also adversely affect the spotted owl.

127.    The Forest Service also determined that downgrading 839 acres of suitable habitat will adversely affect spotted owl critical habitat, but the removal of 610 dispersal acres will not.

128.    Impacts to prey species and impacts from roads would also be adverse within critical habitat, according to the Forest Service.

129.    In the Final EA for the Grasshopper Project, the Forest Service limited its cumulative effects analysis for northern spotted owls to the White River Watershed. The Forest Service said "[a]nalysis at the watershed scale allows for a biologically meaningful analysis and supports management of migratory or dispersal corridors for northern spotted owls."

130.    Directly adjacent to the southern boundary of the Grasshopper Project within the White River Watershed, the Forest Service authorized the 7,173-acre Rocky Restoration Project in 2019. The Forest Service analyzed the Rocky Project in an EA released in December of 2018. Three known spotted owl sites overlap treatment units within the Rocky Project area.

131.    In 2012, the Forest Service also authorized the 1,215-acre Rock Creek Sapling Thinning and Underburning Project in the White River Watershed using a categorical exclusion from full NEPA analysis. The Rock Creek Project lies directly adjacent to the southeast edge of—as well as partially within—the more recently authorized Rocky Project. The Rock Creek Project degraded 155 acres of spotted owl dispersal habitat.

132.    The cumulative effects analysis for the Grasshopper Project offered no quantitative assessment of habitat impacts from these or other timber harvest activities.

133.    The Hood River, Fifteenmile Creek, and Sandy River watersheds are each less than ten miles from the Grasshopper Project area. The Clackamas River Watershed is roughly a dozen miles from the Project area.

134.    Each of these watersheds is within the dispersal range of spotted owls from the
Grasshopper Project area, but the Forest Service excluded these watersheds from its cumulative
effects analysis.

135.    The Forest Service did not engage in consultation with FWS regarding the Grasshopper
Project's effects on northern spotted owls or critical habitat, but instead initially relied on a
January 2020 programmatic BiOp to fulfill its ESA Section 7 obligations.

136.    In June of 2023, FWS issued a new programmatic BiOp for timber harvest and routine
activities in Mt. Hood National Forest, which acknowledges large wildfires that occurred after
FWS issued the January 2020 BiOp.

***Impacts to Snag Recruitment from the Grasshopper Project***

137.    Large snags, or standing dead trees, are very important habitat components for northern
spotted owls, pileated woodpeckers, and American marten, among other species.

138.    According to the Wildlife Report prepared for the Grasshopper Project, the selected
Alternative 1 will result in a severe, long-term reduction in the recruitment of snags per acre.

139.    Across the Mt. Hood National Forest, snags are already found at levels lower than the
historic range of variability, and the White River "[W]atershed is deficient in high concentrations
of large snags with 14 percent of the area with 10 or more snags per acre historically and 7
percent currently."

140.    Yet the Final EA says that "there would be no meaningful impact" to snags from
Alternative 1 "at the watershed scale and there would be sufficient quantities in units and across
the landscape to provide for the needs of dependent species over time."

141.    Oregon Wild objected to the Final EA's failure to accurately disclose the long-term
negative effects on snag habitat recruitment from the Grasshopper Project.

*Scientific Controversy and Uncertainty Regarding Logging in Mature Forests*

142.    In comments, Oregon Wild told the Forest Service that there is scientific controversy over the question of whether and to what degree it is beneficial to thin older trees to accelerate late-successional characteristics, and that an EIS is needed to address this question.

143.    Oregon Wild also said that "thinning the harvest units that are over 50 years old is more likely to have significant environmental impacts and the long-term benefits of accelerating development of late-successional characteristics is uncertain at best."

144.    In its objection, Oregon Wild raised concerns that the EA failed to account for the fact that there is a low probability that fuel treatments will encounter wildfire before fuels regrow.

145.    In its objection, Oregon Wild said that "uncertainty indicates significant effects requiring an EIS," particularly due to potentially significant effects on spotted owl habitat and mature and old-growth forests.

146.    The Forest Service failed to engage with much of the science and information provided by and cited to by Plaintiff Oregon Wild and the public.

147.    Instead, in the DN/FONSI, the Forest Service asserted that "the science behind fuels and vegetation management techniques is sound, and is not highly controversial based on a review of the record that shows a thorough review of relevant scientific information."

148.    Yet the Fuels Report for the Grasshopper Project acknowledged that the Forest Service intends to apply "principles of fire resistance for dry forests" in both wet and dry stands.

149.    The Forest Service pointed to no scientific information supporting the use of VDT in mature, moist mixed-conifer stands operating within the normal range that currently provide suitable spotted owl habitat, such as those within the western portion of the Grasshopper Project area. All scientific references instead concern dry ponderosa pine or Sierra Nevada forests.

150.    In its response to comments on the Draft EA, the Forest Service conceded that there is "uncertainty about future wildfire occurrence, spatial extent, and severity," and that "the debate about active management related to wildfire risk for forests used by spotted owls remains unresolved."

151.    Similarly, the Forest Service has acknowledged that there is uncertainty about the potential benefits of thinning treatments in mature moist forests within the northern spotted owl's range. *See* Spies *et al.* 2018, Northwest Forest Plan Science Synthesis, Chapter 3: Old Growth, Disturbance, Forest Succession, and Management in the Area of the Northwest Forest Plan.

152.    The lack of specificity about the locations and frequency of higher-intensity logging prescriptions—and resulting low basal areas—authorized within Grasshopper Project units also indicates significant uncertainty regarding the severity of impacts to spotted owl habitat and snag habitat recruitment.

***Carbon Storage and Emissions and Executive Orders 13990 and 14072***

153.    Oregon Wild objected to the Forest Service's failure to consider alternatives for the Grasshopper Project that harmonize the competing objectives of climate change mitigation and climate change adaptation, citing EO 13990. Climate change mitigation involves keeping carbon in the forest and avoiding greenhouse gas emissions to the atmosphere from logging. Climate change adaptation may involve a variety of actions that range from reducing stand density to reduce water stress to maintaining cool/moist habitat refugia for wildlife that thrive in dense forests.

154.    Oregon Wild also asserted that the authorization of logging in mature and old-growth stands within the Grasshopper Project area runs counter to EO 14072, which directs federal agencies to both retain and enhance carbon storage and conserve biodiversity.

27 – FIRST AMENDED COMPLAINT

155.    Oregon Wild also said that EO 14072 constituted significant new information that the Forest Service should have analyzed and presented for further public comment and informed decision-making.

156.    The Forest Service responded that it did not need to consider EO 14072 in relation to projects like the Grasshopper Project.

157.    Oregon Wild also objected to the Forest Service's failure to consider the carbon trade-offs of logging in the Grasshopper Project area, and objected to the agency's failure to consider carbon emissions with and without logging.

158.    Oregon Wild asked the Forest Service to calculate the social cost of carbon emissions for the Grasshopper Project, and directed the agency to use available tools to do so, along with applicable policy direction from the current administration (EO 13990).

159.    The Forest Service responded that it is not required to address the social costs of carbon.

160.    The Forest Service failed to prepare a quantitative analysis of carbon stocks and flows for the Grasshopper Project and asserted it is not required to do so, despite available information and tools.

161.    Instead, the Forest Service produced a four-page Climate Change Report for the project that qualitatively addressed its impacts on carbon storage and emissions in the most general and cursory terms.

162.    The Forest Service asserted the project "would make an extremely small contribution to overall global and regional emissions," and that the project's contribution to global greenhouse gases and climate change would be "negligible."

163.    The Forest Service further asserted that carbon emissions during project implementation "would have only a momentary influence on atmospheric carbon concentration" because the

forest will eventually sequester carbon again as it regrows, but such re-sequestration happens over many decades in contrast to the immediate impact of emissions and lost carbon storage from logging.

164.    The Forest Service did not articulate or disclose any criteria for significance in terms of the emissions of a project contributing to global emissions or climate change.

165.    The Forest Service also relied on a carbon assessment for the entire Mt. Hood National Forest that obscures the significance of greenhouse gas emissions from the Grasshopper Project.

166.    Oregon Wild offered scientific citations supporting increased carbon storage to benefit spotted owls and other wildlife species, science that disputes the efficacy of thinning for climate adaptation, and science pointing out that encounter rates between fuels reduction treatments and disturbance events are typically low and only modestly effective.

167.    The Forest Service did not respond to these scientific citations.

***Additional Objections to the Grasshopper Project by Oregon Wild Members***

168.    Oregon Wild members Tom Russell and Rachel Freifelder also timely submitted objections to the Grasshopper Project.

169.    Russell specifically objected to the Forest Service's failure to consider cumulative impacts to spotted owl habitat and mature and old-growth forests from other logging projects within Mt. Hood National Forest, including the Zigzag, North Clack, and Waucoma projects, along with other projects categorically excluded from NEPA analysis, and logging on non-national forest lands.

170.    Russell also objected to the Forest Service's authorization of logging within mature and old-growth stands prior to the completion of an inventory of such forests and plans for their conservation are developed, as required by EO 14072.

171.    Freifelder objected to commercial thinning practices that lead to conditions conducive to and that promote the spread of fire by drying out microclimates, increasing temperatures and wind speeds through canopy reduction, increasing slash and other dry surface fuels, and fostering thick growth of young tree seedlings.

**The Gate Insect and Disease Project**

172.    In October of 2022, the Forest Service announced the forthcoming Gate Insect and Disease Project to the Wasco County Forest Collaborative.

173.    On February 6, 2023, the Forest Service issued a scoping letter about the Gate Insect and Disease Project to the general public.

174.    Oregon Wild submitted timely scoping comments on the Gate Project on March 1, 2023, and timely supplemental scoping comments on March 8, 2023.

175.    On April 27, 2023, the Forest Service issued a Decision Memo for the Gate Project, authorizing commercial thinning on 2,415 acres and pre-commercial thinning on 560 acres in the Barlow Ranger District of Mt. Hood National Forest.

176.    The total treated area for the Gate Project encompasses 2,975 acres, just below the 3,000-acre limit to categorically exclude the project from full NEPA analysis under the Healthy Forests Restoration Act.

177.    The Gate Project area lies just a few miles south of the Grasshopper Project area nearly adjacent to the Rocky and Rock Creek project boundaries. The Gate Project is also within the White River Watershed.

178.    1,888 acres of the Gate Project area are within the ECN-7 critical habitat sub-unit for northern spotted owls, the same sub-unit adversely affected by the Grasshopper Project.

179.    The Decision Memo for the Gate Project does not mention the Grasshopper Project or the potential for cumulative impacts to spotted owls, critical habitat, or other values from the combined projects.

180.    Neither the EA for Grasshopper Project nor the Grasshopper DN/FONSI mention the Gate Project or the potential for cumulative impacts to spotted owls, critical habitat, or other values from the combined projects.

181.    The Wildlife Biological Evaluation and Specialist Report for the Gate Project mentions the Grasshopper Project once, as well as the nearby South Pen Insect and Disease Project, conceding that the three projects were designed to be adjacent to and in conjunction with one another "in order to achieve landscape-level treatments."

182.    Similarly, the Wildlife Report for the Grasshopper Project acknowledges that the Forest Service designed the Grasshopper Project "adjacent to and in conjunction with other treatment areas such as the Rocky Restoration Project in order to achieve landscape-level treatments."

183.    The Gate Project will remove suitable and dispersal spotted owl habitat for up to 11 miles of road construction, and degrade the quality of 332 acres of foraging habitat and 971 acres of dispersal habitat.

184.    The Forest Service contends the Gate Project is "not likely to adversely affect" the northern spotted owl or critical habitat, relying on a programmatic 2017 Biological Assessment and 2017 Letter of Concurrence from FWS.

185.    The Forest Service stated that its "[a]nalysis and consultation requirements are met under ESA [sic] through use of this programmatic consultation."

186.    The Forest Service indicated in its Decision Memo that the Gate Project would be implemented beginning in the spring of 2023.

**The 27 Road Fuel Break Project**

187.    In April of 2023, the Forest Service listed in its Schedule of Proposed Actions a proposal to authorize the 27 Road Fuel Break Project in the Barlow Ranger District of the Mt. Hood National Forest.

188.    On May 5, 2023, the Forest Service announced the 27 Road Fuel Break Project to the Wasco County Forest Collaborative.

189.    On July 7, 2023, the Forest Service issued a scoping letter about the 27 Road Fuel Break Project to the general public.

190.    The Forest Service intends to categorically exclude the 27 Road Fuel Break Project from full NEPA analysis pursuant to the 2021 Infrastructure Investment and Jobs Act.

191.    The 27 Road Fuel Break Project lies directly north of Bonney Crossing Campground and the eastern end of the Grasshopper Project area. The 27 Road Fuel Break Project extends north into the Fifteenmile Creek Watershed and south into the White River Watershed.

192.    The 27 Road Fuel Break Project would remove trees across at least 2,900 acres in 1,000-foot wide swaths along nine roads adjacent to or in close proximity to the eastern edge of the Badger Creek Wilderness.

193.    The Forest Service acknowledged that the 27 Road Fuel Break Project will adversely affect spotted owls and designated critical habitat by removing foraging and dispersal habitat for the species.

194.    Oregon Wild submitted timely scoping comments on the 27 Road Fuel Break Project on August 7, 2023.

195.    The scoping comment period for the 27 Road Fuel Break Project concluded on August 7, 2023, and the Forest Service has indicated a decision for the project will be signed imminently.

196.    No materials released by the Forest Service to the public about the 27 Road Fuel Break Project mention the nearby Grasshopper or other projects, or the likelihood or possibility of cumulative effects to spotted owl habitat or other environmental values.

197.    Neither did the Forest Service mention the 27 Road Fuel Break Project in any of its Grasshopper Project cumulative effects analyses, despite the two projects' close proximity in time and location.

## CLAIM FOR RELIEF

### (Violations of NEPA and APA)

198.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs into each count below.

### Count One – Failure to Prepare an Environmental Impact Statement

199.    NEPA requires that federal agencies prepare an EIS when a major federal action is proposed that may significantly affect the quality of the environment. 42 U.S.C. § 4332(C). Impacts that must be studied in an EIS include effects to the functioning of affected ecosystems. Impacts may be beneficial as well as detrimental. 40 C.F.R. § 1508.8(b).

200.    NEPA requires that an agency prepare an EIS if "substantial questions" are raised about whether its decision may cause significant degradation of some human environmental factor.

201.    An agency's decision not to prepare an EIS must be fully-informed and well-considered, supported by a convincing statement of reasons why impacts are not significant.

202.    In deciding whether an action may have a significant impact, the agency must consider the context and intensity of the proposed project. 40 C.F.R. § 1508.27.

203.    The intensity of the project includes consideration of whether impacts are both beneficial and adverse, the degree to which the effects of the project are likely to be highly controversial,

whether the possible effects are highly uncertain or involve unknown risks, whether the action

will impact areas with unique characteristics of the geographic area (such as ecologically critical

areas), the degree to which the action threatens endangered or threatened species of their critical

habitat, and whether the action is related to other actions that together with it have cumulatively

significant impacts. 40 C.F.R. § 1508.27(b).

204.    The agency's statement of reasons must convincingly show that none of these factors

indicates an action's impacts may be significant.

205.    Substantial scientific dispute and uncertainty exists regarding the effects of the

Grasshopper Project on ecosystem health, northern spotted owls and critical habitat, other

wildlife species and habitat, carbon storage and emissions, climate change adaptation, and future

fire risk and behavior.

206.    The Grasshopper Project's effects are highly controversial because the Forest Service

intends to apply dry forest treatment prescriptions to previously unmanaged or very lightly

managed mature, moist mixed-conifer forests operating within the normal range without

scientific evidence to support the efficacy of such logging to reduce fire risk, modify future fire

behavior, or beneficially alter or maintain habitat components needed by northern spotted owls

and other species.

207.    The Grasshopper Project's effects are highly unknown and uncertain because the Forest

Service failed to disclose what intensity of logging will occur in particular units, but instead

prescribed a wide range of basal areas left to operators' discretion during implementation.

208.    The Forest Service failed to adequately disclose and consider both the beneficial and

adverse impacts of the Grasshopper Project. The Forest Service failed to disclose and consider

whether the expected adverse effects of logging on spotted owls and the long-term reduction in

snag habitat, combined with adverse climate effects caused by logging-related carbon emissions and loss of carbon storage, are outweighed by the project's alleged beneficial effects on forest health and resiliency.

209.    The Forest Service concedes that the Grasshopper Project will adversely affect northern spotted owls, a species listed under the ESA, by downgrading over 1,200 acres of suitable habitat through logging, affecting seven historic spotted owl home ranges, adversely affecting spotted owl prey species, and through road construction.

210.    The Forest Service also concedes that the Grasshopper Project will adversely affect designated northern spotted owl critical habitat—by definition an ecologically critical area—by downgrading 839 acres of suitable habitat and through impacts to prey species and through road construction.

211.    Contrary to the Forest Service's statement in the FONSI that "there are no known long-term adverse effects or cumulative effects" of the Grasshopper Project, the project will have long-term adverse effects on wildlife, wildlife habitat, carbon storage and emissions, and other environmental values.

212.    The impacts of the Grasshopper Project will be cumulative with other actions in the White River and adjacent and nearby watersheds within the dispersal range of spotted owls, including but not limited to the Gate Project and 27 Road Fuel Break Project, yet the Forest Service failed to analyze such cumulative impacts.

213.    The Final EA and DN/FONSI for the Grasshopper Project do not contain a convincing statement of reasons why these impacts are insignificant.

214.    Substantial questions inherently exist about the potentially significant adverse impacts of the Forest Service's decision to authorize the Grasshopper Project, which will result in the loss of

carbon storage across thousands of acres of mature forest stands, reduce large snag recruitment for decades, and eliminate at least 1,200 acres of valuable spotted owl habitat that will no longer function as suitable habitat for the species, despite a pressing need to immediately preserve such habitat in the face of barred owl competition and accelerated spotted owl population declines.

215.    The Forest Service's failure to prepare an EIS for the Grasshopper Project violates NEPA and its implementing regulations and is arbitrary, capricious, an abuse of discretion, not in accordance with the law, and without observance of procedure required by law. 5 U.S.C. § 706(2).

**Count Two – Failure to Take a Hard Look at Direct, Indirect, and Cumulative Impacts**

216.    An EA must provide sufficient evidence and analysis, including disclosure and consideration of the environmental impacts of a proposed action and alternatives, to determine whether to prepare an EIS or a FONSI.

217.    The agency must disclose, analyze, and consider the direct, indirect, and cumulative effects of a proposed action.

218.    To take the required "hard look" at a project's effects, an agency may not rely on incorrect assumptions or data. The information must be of high quality. Accurate scientific analyses, expert agency comments, and public scrutiny are essential to implementing NEPA.

219.    The Forest Service failed to disclose, analyze, consider, and otherwise take a hard look at the Grasshopper Project's direct, indirect, and cumulative impacts on, *inter alia*, mature and old-growth stands, northern spotted owls, snag recruitment, carbon storage and emissions, and fire risk and behavior.

220.    The Forest Service failed to take a hard look at the cumulative impacts to northern spotted owls and critical habitat from other projects and activities, including but not limited to

the nearby Gate Insect and Disease Project located just a few miles south of the Grasshopper Project area, and the nearby 27 Road Fuel Break Project located just north of the eastern end of the Grasshopper Project area.

221.    The Forest Service failed to rationally explain its limited cumulative impacts analysis area for northern spotted owls, despite dispersing owls traveling distances well beyond the boundaries of the White River Watershed, and despite Oregon Wild member Tom Russell directly objecting to the Forest Service's failure to consider the Zigzag, North Clack, Waucoma, and other categorically-excluded projects from its cumulative impacts analysis.

222.    The Forest Service failed to utilize available tools and information to take a site-specific hard look at the impacts of the Grasshopper Project on carbon storage and emissions, including the social cost of carbon, and further failed to update its analysis and consideration of alternatives in light of Executive Order 14072, which states the current presidential administration's policy to conserve mature and old-growth forests on federal lands, in part for their ability to absorb and store carbon from the atmosphere.

223.    The Forest Service failed to rationally explain its determination that large snags would continue to be provided across the Mt. Hood National Forest, despite an on-going deficit in snag habitat and a drastic and long-term reduction in snag recruitment as a result of the Grasshopper Project.

224.    The Forest Service failed to rationally explain its application of dry forest treatments to mature, moist mixed-conifer forests under the guise of fire risk reduction and fire behavior modification, further failed to take a hard look at increased fire risks from canopy removal, stand density reduction, and gap creation, and failed to provide a logical and compelling rationale for its determination that expected benefits outweigh these risks.

225.    The Forest Service's failure to sufficiently disclose, analyze, and consider the direct,

indirect, and cumulative impacts of the Grasshopper Project violates NEPA and its implementing

regulations and is arbitrary, capricious, an abuse of discretion, not in accordance with the law,

and without observance of procedure required by law. 5 U.S.C. § 706(2).

### REQUEST FOR RELIEF

Plaintiff Oregon Wild respectfully requests that this Court:

a.  Adjudge and declare that Defendant's approval of the Grasshopper Project violated
    NEPA and its implementing regulations, and thus is arbitrary, capricious, an abuse of
    discretion, and contrary to law;

b.  Hold unlawful and set aside the DN/FONSI and EA for the Grasshopper Project, and
    order Defendant to withdraw the DN/FONSI and EA and any associated contracts until
    such time as Defendant demonstrates it has complied with the law;

c.  Enjoin Defendant and its contractors, assigns, and other agents from proceeding with
    commercial logging prescriptions within stands or units with age classes of 80 years or
    older, specifically those areas consisting of late-successional, mature, or old-growth
    forest that provides northern spotted owl habitat, unless and until the violations of federal
    law set forth herein have been corrected;

d.  Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive
    relief as may be prayed for hereafter by Plaintiff;

e.  Award Plaintiff its costs of suit, reasonable expenses, and attorney fees pursuant to the
    Equal Access to Justice Act, 28 U.S.C. § 2412.

Respectfully submitted this 30th day of October, 2023.

_____

John S. Persell
Oregon Wild
5825 N Greeley Avenue
Portland, OR 97217
(503) 896-6472
jp@oregonwild.org


Meriel L. Darzen
Crag Law Center
3141 E Burnside Street
Portland, OR 97214
(503) 525-2725
meriel@crag.org